Our first case for this morning is REXA, Incorporated against Mark Chester and MEA, Incorporated. And we are ready to hear from Mr. Bailich. Thank you, Your Honor. And may it please the Court, my name is Jason Bailich. I represent Plaintiff Appellant REXA, Inc., successor of COSO America, Inc., to the REXA actuator business. But it's not a full successor, is it? It looked like an asset sale to me, part of the business. That's not really – that's something in between a full successor and just a downstream purchaser. You're right, Your Honor. So COSO America, Inc. transferred all of the assets, all of the contracts, all of the intellectual property from itself to a newly formed entity, REXA, Inc., that was owned by the same eventual beneficial owner as COSO America, Inc. I thought it was just the actuator business and not the valve business, that there is still a COSO company. That's correct. So the 2014 plan of reorganization explained that there was two businesses, a globe-style valve business, which remained with COSO, and then the actuator business, which was then transferred to REXA, Inc. Okay. And so in effect, in all legal effect, REXA, Inc. was the successor of the actuator business to COSO America, Inc. See, here's my issue with that. I mean, there's a tremendous amount of law about which obligations flow through when there's an asset sale and which obligations flow through when there's an equity reorganization of a company. And I didn't see much of that here. And your argument depends critically on the fact that when somebody bought assets, they also inherited liabilities, they inherited contracts, and I'm not sure that that's a given. Well, the 2014 plan of reorganization sets forth that all of the assets, all of the contracts that pertain to the actuator business were transferred to REXA, Inc. And the plan of reorganization had a choice of law clause selecting Delaware law, and under Delaware law, this type of agreement is effective in transferring the assets, the contracts. So here's my other question for you, and then I'll let you proceed or my colleagues ask questions. It's not at all clear to me either what contract, actual contract you think was transferred, and it's even less clear to me what precisely is the trade secret that you think we're talking about here. So if you could address those, that would be helpful. Sure. Well, the contract is fairly simple. Mr. Chester was COSO's mechanical engineering manager, and in 2002, COSO management asked him to lead a project to develop a new patentable design for the company. Mr. Chester testified that as part of that project, he designed and assembled a prototype actuator of a type that was not known in the industry. The only difference was that it was using the solenoid actuator instead of this flow control thing, right? That was not the only difference. There were a number of changes that had to be made in order to make the solenoids work, and that design, which we reproduced in our brief hydraulic schematic of that prototype, was not known in the industry. Mr. Chester testified. But the use of solenoid valves was widely known as an option. That's correct, but this court has held— So what is it? Is it that it's a solenoid valve, or is it the combination? What exactly is the new thing that was valuable only because it was being kept secret? Sure. It was the design of the actuator. So it was the piston that was fluidly connected to a hydraulic pump with solenoid valves in between each end of the hydraulic pump that could then lock the position of the actuator in place. This was the part of the design that was not known in the industry, and this was the trade secret. Mr. Bailich, is it the plaintiff's contention that Mr. Chester never saw the sketch, never saw the source code, and just kind of recalled this 11 years later and put it into effect in 2013? Well, Mr. Chester testified that he's the one that designed the actuator, that he's the one that assembled the actuator, and he's the one that operated the actuator. And the actuator you're referring to is the 2002 as opposed to the Hawk? That's correct, the 2002 prototype. And so from that standpoint, if you're the one who invents something, you can't then just forget about it and then several years, many years later, reinvent it for somebody else. Well, that's actually not necessarily true. It depends on whether you've been under a confidentiality agreement. It depends on to whom the intellectual property was assigned or in whom it resided, whether it was assigned or not. I think we can't assume the proposition that you just stated. Well, and that's true. And under Massachusetts law, when an employee is directed to invent something or improve some part of the company's business and is paid for his efforts, that employee has an implied, in fact, obligation to assign those designs to the company. And that's exactly what happened here. Well, your opponents argue that that was not, in fact, the nature of Mr. Chester's job. He has this brief period when he's looking at the 2002 project. He also happens to be working with Mr. Enos and Mr. Goldsmith. Mr. Chester doesn't do the coding. He doesn't know anything about that part of the project. And the project is shelved, I'll just say. You say that it was put in the back burner so that you wouldn't be making competition for yourself, and they say it was shelved because it just wasn't a promising effort. But you're trying to squeeze him under this work-for-hire idea that we see in patent law and we see in trade secret law. But what if that wasn't his job? Well, first of all, what the law is, is any time management directs an employee to make an improvement and pays the employee to do that, then that falls under this implied-in-fact obligation to assign the inventions. All of what you mentioned about Mr. Chester not knowing about something, those are arguments that defendants make, and it's up to a jury to decide whether they believe Mr. Chester, who testified that he's the one that designed the actuator and assembled it and operated it, or defendants' arguments. Mr. Bailey, I need to pursue this question about value from secrecy a little bit with you. I've never seen a trade secret case like this one before, where the plaintiff is relying on something that didn't apparently achieve its intended purpose and just sat in the files for 15 years before suit was filed. In what sense do you claim that the COSO 2002 experiment was successful? Thank you, Your Honor. Well, it was successful in the sense that it developed a new design that was not known in the industry. And had COSO brought that forward and commercialized it, it would no longer be a trade secret, and it would compete against its existing XPAC actuator. But the purpose, according to the internal documents, was to come up with an alternative design to avoid having to pay REXA royalties, right? That's correct. And it was not successful in doing that, correct? Well, and I just want to correct something that I said. It wasn't not to pay REXA royalties. There was a different holding company that held a patent, so it was not to pay royalties. It was an affiliate? No, it was a separately owned company. Ah, okay. Okay, so you wanted to get out from under the royalty obligation, but the 2002 project failed in that goal, correct? Well, no, Your Honor. So apart from whatever goal— How did it achieve that goal? So when the prototype actuator was developed, the company made the choice to keep on paying the royalty and to keep the new design a secret. So let me follow two parts of that answer. So it did not achieve the intended goal, correct? You seem reluctant to admit that. I will admit that COSO did not commercialize that design and therefore— Okay, and is there any contemporary evidence indicating that COSO or anybody in it thought, boy, this is a dangerous competitive threat to our expat and we've got to make sure that this never sees the light of day unless we do it? So certainly there is no document that says that, but there's testimony from the people who were around at that time that explained that this was a novel design and that it was going to be more valuable to the company to keep it secret. Okay, was any of that testimony in terms of a competitive threat? So certainly there was testimony that the company didn't want to commercialize the product to compete and cannibalize its own actuator sales. But isn't that all like way after the fact? There's nothing contemporaneous to that effect, is there? Well, the reality of it is that this is a small company. As you saw, the design file was only kept by one person, and that one person who kept the design file is the person who testified that this design is a trade secret, so it didn't cannibalize its own sales. I mean, that's easy to say, but it seems to me that raises another question, which is what efforts did First Koso make to actually keep this secret? It seems to me all you said was that they had a lock on the door and people had to log in to their computers, which frankly didn't strike me as all that unusual for any company or anything. There's no particular – it doesn't say confidential on the drawing that you put in the record. It doesn't in any way indicate the type of efforts you usually see when somebody is trying to protect a trade secret. Well, Your Honor, for that I direct you to the Whips case and the Jet Spray Cooler case because the facts of this case are mightily similar. In those cases, there wasn't even a design file. There wasn't any documentary evidence. Well, Jet Spray Cooler, there was a trade secret court, and defendants there took those trade secrets to competitors or to start a new company, and the courts in those cases found that because these were trusted employees, that that was enough of a reason. These are these district court cases that you're relying on? These are district court cases in the District of Massachusetts. That's correct. But for instance, I'll give you a Seventh Circuit case. The Elmer Miller case is one where the trade secret was customer information, and it was simply put in a closed file drawer in the back room, and this court held that that was sufficient measures of protection. In the Playwood Toys case, this court held that the purpose of the reasonable measures is only to prevent a plaintiff who takes no affirmative actions whatsoever in obtaining trade secret protection. And in this case, it's undisputed that only a few key COSO employees ever knew about the trade secret designs, and every one of them testified that he knew that those designs were to be kept secret except for Mr. Chester. So this is a fact issue for the jury. The jury should be able to hear that evidence and make a factual determination. Did they believe these other employees, or did they believe Mr. Chester? Well, I guess I'm still trying to understand, Mr. Bailick, the value here since the 2002 design did not achieve its purpose and the Hawk is competitively successful in the market. That suggests to me that there is some difference between them that has not yet been articulated. Can you help me with that? So there were many purposes to the 2002 project. Certainly, paying royalties was one of them. But in the request for design, the request was to create a new patentable design for the company, and Mr. Chester himself testified that that's exactly what he did. Which also didn't happen. That didn't happen, and the time in which you – I'm a little rusty on my patent law being on the Seventh Circuit these days, but I would have thought that when it was invented and you had a prototype, there was a pretty short time limit for you to apply for a patent, right? No, Your Honor, actually. That's where trade secret law and patent law diverge, because the whole purpose of keeping something as a trade secret is not to – I'm well aware of the differences between patent law and trade secret law, Mr. Bailick. My question is, if you're saying the goal was to develop a patentable valve that your client would own, and it was invented, according to your evidence, in 2002, when did you have to – when would you have had to apply for a patent for it? So long as it's not disclosed, there is no timeline. And the fact that Mr. Chester and MEA eventually did file a patent application, which was allowed by the Patent Office, shows that this was a patentable design. You're skipping over quite a few intermediate steps. The Patent Office turned them down a couple of times. They refined the claims and so forth. So there was actually some distance between even what was originally filed by MEA and something patentable, and one imagines even further distance between this half-thought-out project that you had in 2002. Your Honor, Mr. Chester testified and admitted that the actuator that he created in 2002 met every single limitation of an allowed claim, so it was patentable. Why – well, this gets into claims construction, which is, again, something we don't like to do. No, no, no. When asked, it amounts to factual disputes at the very best and why the jury should hear this case and determine whether – Could I ask you about some of these issues of litigation, misconduct, and fee issues? Did you ask for an evidentiary hearing in the district court on the issue of attorneys' fees or the litigation misconduct? No, Your Honor, because – no, we were never warned by the judge that this was something that he was considering. And so you're right. The fee issue is one where the judge made his determination based on the cold evidence, the same evidence that's before you, making no determinations of credibility or anything with that. And I see that my time is – But you didn't ask for a hearing. I mean, you're telling us now that you want a hearing on those issues, for example, with Mr. Hines, to explain that, yes, the documents really were kept this way in the ordinary course of our files and so on, and you should believe me, but I didn't see that in the district court record. So is that a problem? So, Your Honor, we didn't ask for a hearing because the sole evidence, the sole testimony evidence was that there was no litigation misconduct. We have sworn testimony that documents were produced exactly as they were found and sworn testimony that – The district court found that exceedingly improbable. So then this is something that should be heard, should be – as it pertains to the summary judgment motion before a jury to make factual findings. And, Your Honor, I see that my time is almost up, and I'd like to reserve the rest of my time for rebuttal. Do you have any other questions? Yeah, we may – our time limits are sometimes a little bit flexible. I hope they might be on this one, but – Yeah, I'll give you a little bit of time for rebuttal, but it's important to answer the judge's questions. Yeah, Mr. Bailey, if we go back to the work on the 2002 prototype, did I read correctly that that prototype used $800 solenoid components? I don't specifically remember how much the solenoids cost, but they were solenoid valves that were in the company's inventory during the project. But the goal was to design a product that would sell for about $100, right? Oh, no. No, no, not at all. So these actuators cost tens and sometimes $20,000. Okay. Maybe I misread that. Thank you. And then did the severance plan that was offered to some employees, did that refer explicitly to an Appendix A or B? So the severance plan itself did refer to appendices. There was multiple plans with overlapping documents. And so, yes, the severance plan did refer to an Appendix A that listed employees that were – What's the list of employees on which Mr. Chester did not appear, correct? That's correct. Did it refer to an Appendix B? It did, and there was also an Appendix C. And the sworn testimony from COSO's president at the time, Kevin Hines, was that he presented Mr. Chester with his bonus letter with the unsigned non-disclosure agreement and asked him to sign it. Did the bonus plan refer to the appendices? Off the top of my head, I don't remember. Specifically to the – I didn't see it, but the confidentiality agreement. Okay. Let me just check notes for a moment. And I think we've at least tried to ask everything else I had on my list, so thank you. All right. Thank you very much, Mr. Bailich. Thank you, Your Honors. We will hear now from – I'm not sure how to pronounce your name – Mr. Kinnaid? Thank you, Your Honor. It is Mr. Kinnaid, Terrence Kinnaid, for the defendants. I would like to address a couple of things that the opposing counsel just brought up. And first, with respect to the trade secret, we heard him say that it was a new product because it had a piston and a hydraulic pump, but that was actually in the expat. We've maintained throughout that the plaintiff has never really identified its trade secret. It's always been vague. And when you have a vague trade secret, it's hard to be governed as to how to behave with the trade secret. So there was this undisputed that this device was a brief substitution of solenoid valves for their very special flow-matching valves, which are already in the expat. And this court has found similar situations where a plaintiff tries to assert a broad category of device as a trade secret and says it's not specific enough. We've heard today that Mr. Chess… Before you move on from there, could I just ask you – it was my understanding reading the briefs, and believe me, I'm as far from an expert on actuators as you can get – that at least solenoids have been used for a very long time. There's nothing unusual about that. But what about the idea that it's actually the combination? You know, it's putting the whole device together in the ways that it was done that was actually the invention, the new thing. So it's interesting. To the extent which they had not claimed below, to the extent that they claim, for instance, the code associated with solenoid valves is important, Mr. Chester had nothing to do with the code and has no opportunity to certainly misappropriate the code or even know about the code. So if that's the claim, then it should fail, and it does fail. But it was never clear below what the claim was as to what the trade secret was. So it wasn't clear below. It wasn't clear to the district court. It wasn't clear to Mr. Chester. So that's, to us, the core problem with bringing this kind of case, where you have someone who is not advised as to how to behave, and that was a problem here. But, yes, solenoid valves have been used to control actuators for a long time. And, in fact, as the court alluded to, there are interim patent processes here where we essentially learned, everybody learned, that there was prior art in this Keene reference that essentially claimed all of the various things that are an issue. The one thing we're getting a patent on is something very distinct. It has to do with the timing of the opening and closing of the solenoid valves versus the motor stopping and starting. That's something that the 2002 device never had anything to do with. In fact, I think that's the opposite. So in terms of whether it's a secret, we don't have that proof before the district court or here or certainly to Mr. Chester, who needs to know how to conduct his life in the decade after he leaves the company. What about the insistence that Mr. Bailich has repeated that there are factual issues here, such as whether at the time they decide to terminate the 2002 project, they thought they had something valuable, but they just didn't want to use it right then, so they dismantled the prototype and they put everything away, or their notion that this is, in fact, a commercially reasonable item. Are these just credibility issues that a jury should hear? What I would say is that they're immaterial issues, Your Honor. The idea is you may have realized in our briefing we didn't try and respond and fight and say those are disputed fact issues because the real issue is whether this is secret. In terms of whether it worked or whether it was abandoned or not abandoned or whether it had value or not value, it doesn't get to the heart of was it secret. Was it something that was a novel device? But in addition, we go into whether it was preserved. That matters for the definition of trade secret. The preservation goes to the definition. So we heard today that COSO, it was kept secret because it was only a few people knew about it. That's not enough. You have to actually have an instruction that says that. So they cited the Elmer Miller case and they cited the Learning Curve case. Those are small shops. In the Elmer Miller case, the court will recall that there were two or three people in that shop and everyone was instructed as to what to do. So there wasn't confusion. There was an actual, you know, maybe the boss said this is going to be a secret. It's in this drawer. And everybody understood that. In the Learning Curve case, there was evidence that established a confidentiality agreement. It was oral, but there was an agreement. In this case, there's no facts. It's undisputed that there was no instructions. There was no contract. There were no labels. There's no policy. It's just not a trade secret environment. And that's all undisputed. In this court, we cited the tax track systems case. This court finds when you're lacking those things, it's not a trade secret. And that's a starting point. So, Mr. Kanade, can I maybe resolve one issue that seems to have bothered the district court very much? And that is the question whether COSO and the current incarnation of REXA are, in fact, one in the same company. The district court seemed quite persuaded that they were not and that it was thus misleading for the plaintiffs to say, say that Mr. Chester had been employed by REXA when, in fact, it was at the time of the 2002 effort, it was COSO. I mean, wasn't that an overreaction? I mean, there is a relationship among these companies. And when there was the reorganization in 2014, I know it was just the actuator assets that go over, not the valve assets. But it's certainly a successor company in meaningful ways. So, didn't the district court put too much weight on these formalities? So, I'm not prepared to say whether the court overreacted or didn't overreact. He's an experienced jurist. We all know him, but the thing is he gave, as an inherent court power, a very hefty attorney's fees award. And if it was based on, you know, an overassessment of the importance of something, it's a big deal for him. It's important in the sense that it was in the complaint and it was misstated in the complaint. And even to this day, you're not hearing REXA come forward throughout the life of the district court proceedings. Never acknowledged. No contrition. No, I'm sorry, this is confusing. But why does it matter? I can think of all sorts of companies who have gone through different incarnations and sometimes different names. There was Esso, and then it became the Humble Oil and Refining Company, and now it's Exxon, and then it's Exxon Mobil. And we all, no one would say that if you called it Exxon and you were really talking about some period of time when it was known as Humble, that you are misleading anybody. You're just using a general name. So, why isn't that what was happening here? And so, I cannot speak to why the court was particularly upset about this. I would say that we did not engage in, you know, drama associated with this thing. We did highlight that they misstated this in the complaint, but the court found it very significant in the context of the litigation. And this court has recognized in the Fury case that we let the district court be the referee in the field because the district court deals with the whole ball of wax, as we say. And it was several years of this with, there's other conduct that was indicated in the fee opinion and in the fee presentation that came to the court's attention throughout, including discovery conduct, but also we talked about this. Well, this is this deposition, right, to which Judge Hamilton was referring a little while ago. Where one could see it as papers not being produced in the order in which they would have been kept, and also trying to make Appendix B pertain to the bonus when it really pertained to the severance agreement only. So, the issue there, we've heard a lot about, well, was it produced in a certain way, and we've addressed that in the briefs. But really, anyone who studied this thing at all, who had the opportunity to analyze what's going on here, would be able to say, hey, these are my documents, I know this program didn't apply to him, and he would never sign this thing, why am I even bringing this up? And that's, I think, one of the real concerns when we look at the judge being the referee, like, how are you still pushing this button when you don't need to? You came to us with a case that said, we don't actually have any contracts, we have a different basis for seeking relief here. But then they started to do this, and that, I think, was in the whole ball of wax, got the district court very upset. I mean, we were concerned about the exhibit, that was, you know, one of the issues that we have here even now. But now, REXA has said that, well, that's just commonplace litigation, ordinary litigation conduct. The district court said, no, it isn't. And that is the district court's prerogative. It's a highly differential standard to the district court on this thing. I appreciate that it's a fair amount of fees, but that is the cost of litigation these days. There's no doubt that REXA is the dominant entity in this market, and we're the upstart. And they, you know, the district court did find, by citing a case, that it looked like this was a means of oppressing us, to keep us bound up in litigation. In that context, in light of this behavior, we submit that the district court engaged in an appropriate analysis, and it should enjoy a differential standard for its fee award. Mr. Kinnaid, on the fee issue, you asserted in your brief that, in essence, the two sides' fees were at least comparable, and maybe the plaintiffs spent more on fees than your side did. I didn't see a record citation to that, and what support do you have for that assertion? Yeah, under the – your Honor, thank you. The support is in the record, and I'm afraid I don't have the exact – what the cite is, but there's a fee petition process where we submit a very lengthy document where both sides compile all their fees and they go back and forth with all that. So in that process, RECSA submitted – I believe submitted its fee material, and so it's one of the exhibits to the Rule 54 local rule packet, which is, as I say, very voluminous. So I believe it's in there. I'm asking my team if they can come up with a particular cite. I've got the joint statement. I don't know that I've got all the appendices in front of me. It's the – you have to rely on the attachments to the joint statement, which are, as I say, voluminous. There's – all of our fee material is in there. I believe all theirs is. So how did total fees for the two sides compare up to the point at which the fee petition was decided? I don't recall precisely, but obviously our fee request was $2 million. I believe theirs was in that range, but I believe it was maybe a little bit more than that. And again, I'm turning to my colleagues to see if they have a precise number. I don't know that we put that in our briefs to the court. However, I do think below we had highlighted that their fees were somewhat more than ours. On that issue, Mr. Kinnaid, did I hear your argument before to be one that the fee amount was set based upon a David and Goliath oppressor-oppressee type situation, or is it based on some kind of a lodestar approach of multiplication of the hourly fee times the hours at issue? I took it to be the latter, not the former. Yeah, it's no – it's not a formula. It's actually our bills. I mean, the defendants incurred fees in this case, and we kept hourly rate bills that we presented to the court to support the number that we sought. And then, as I recall, the other side also had to submit its bills so that the numbers could be compared, and we used that point in the district court, and the district court, I think, made a comment on it. So your earlier argument about it being some type of means of oppressing your client, you're asserting that that goes to the sanctioning conduct versus the amount of the sanctions? Yes, it does not go to the amount. It's the court itself. When it went through the fee award, just I want to clarify, it's not a statutory award. It's not a rule-based award. It's an inherent authority award, and the court explained that the court was using its inherent power. It was analyzing bad faith. It was analyzing egregious circumstances. It was looking at vexatious conduct, wanton conduct, and oppressive reasons. Those were the standards that the court set and found that this fit that category. But, Mr. Kinnaid, one thing that troubles me about that is take all of that as a given. You know, assume that the district court did not abuse its discretion in characterizing Rex's conduct that way. If the court has decided that the correct remedy, if you will, the correct measure is a fee shift, I was a little troubled because Rex has said that it, in fact, submitted particularized criticisms of some of the fee entries. And in any kind of fee case, the district court will go through it. The district court will ask, you know, was there duplicative billing? You know, did you have too many people on the case? You know, and maybe say yes and maybe say no, but the district court didn't go through that process here, it seems. So, Your Honor, the district court said it went through the process, but it was summary. The district court said we have considered all of those materials and we reject them. So, you know, in terms of did the district court go through it with the green eye shade? We don't know, but other than from the opinion, which says that it considered all the objections, it was certainly presented to the court. All of the objections were presented to the court. They were all addressed. And, you know, I don't intend to debate them here, whether we were you should have been more hours or less hours, but the court went through it. Can I go back to the merits here, Mr. Kinnaid, and what do we do with Chester's testimony to the effect that the 2002 prototype met every element of Claim 3 in the 463 patent application? Why isn't that enough to show substantial similarity and infer misappropriation? I understand you've got a separate point about secrecy, but why isn't that enough to get to a jury? Yeah, so I would invite the court to take a very clear reading of that testimony because what he says is I would have expected it to. OK, it's not the same as him saying that he invented all of these things at that time. I don't think that that happened in the record. And what I would say is also that Rex's official testimony on this from the Rex 30B6 witness is that the only thing Mr. Chester had anything to do with was a check valve. And so when they described the code, there's no dispute that Mr. Chester had nothing to do with the code and never saw it. There's no dispute that specifications were not in Mr. Chester's bailiwick. Yes, he observed this thing in operation, but it's pretty much a very short lived experiment. And that's the extent of it. So I believe that Rex has overstated this notion about what that testimony was. So let me let me try to ask you a question I asked earlier. Why is the Hawk successful and the 2002 CASO experiment was not? I can't speak to the 2002 CASO experiment and whether it was successful or not. I just think we don't have enough information about it. But the Hawk has succeeded in obtaining a patent, as we described to the district court below, because it first of all, you know, function fairly well. But aside from that, it it has this special timing associated with its solenoid valves opening and closing in connection with the motor starting and stopping. This is the milliseconds reference in claim three. I'm sorry, I didn't hear. This is the milliseconds reference in claim three. I believe that's right. OK. OK. But you can't tell us why the CASO experiment didn't go anywhere. Does the record reflect how long it took for your client to develop the Hawk? Yes, I believe the record reflects it took a couple of years as a starting date when they started to work on it and several years. I believe it's from I'm looking at my colleagues to get a more precise date. From prototype to scaled up for the market is what I'm interested in. So I don't know that we use those terms prototype and what have you. But in the record, there's testimony and evidence about Mr. Chester's development of the Hawk at MEA. And it was over the course of a period of a couple of years. Could I could I ask you to address the learning curve case about the wooden train tracks? In particular, the point that plaintiff makes, which is look, we can be entitled to trade secret protection for a valuable idea, even if we haven't commercialized it yet. Even if we're sitting on it, we're entitled to do that. Well, I'm not sure that that's what the learning curve case did. I mean, there was a trade secret developed. They had a flash of inspiration with a certain type of toy train track. And then they revealed it to somebody else under with a confidentiality agreement established. And that became a misappropriation of a trade secret. Part of the part of the factor analysis had to do with how much effort goes into development. And we have the flash of genius idea and so on. But but we also, I thought, made the point that at least under Illinois trade secret law was not necessary for the plaintiff to have commercialized the product, at least not an essential element of a trade secret claim. Right. We we have not asserted to this court that their failure to commercialize it precludes them from establishing a trade secret. The issue here is compared to the learning curve was there was a flash of inspiration where they developed something never before seen and knew. In this case, we they this undisputed. They just took an existing actuator and expat substituted various valves. But ultimately, I'm sorry, I'm out of time. Do you want me to please finish? And I'm I'm going to be giving Mr. Bill a little more to. All right. Thank you. There's no dispute in this case. They just very simply in one of their experiments substituted solenoid valves from inventory to take a look at how it works. The record is, I think, undisputed. That was a very short amount of time involved there and as was learning curve. But learning curve was a burst of inspiration. If the court wants, I do have some dates to assist the court with and record sites that came up. Why don't you give those to us and I'll equalize all of this. All right. So we have the hawk starting in February of 2013. The contact with the patent office in 2014, but ultimately three years to develop the hawk. And that's. Ninety one. That's in our ECF. Ninety one of paragraphs 50, 53 and 52. And then there was another question about where the fee support from Rex's fees were. We have that at ECF 174 dash one at Exhibit B, which is Rex's invoices. So if there's no further questions, we just ask the court to affirm. Thank you. Thank you very much. I'll give you two minutes to rebut Mr. Balich. Thank you, Your Honor. And in those two minutes, I want to address two things. What the trade secret was and whether it was secret, because Mr. Kinnaid said the real issue is whether this is secret. And the reason why this needs to be remanded and remanded to a different judge for trial under Circuit Rule 36 is because both of those at the bare minimum are subject to a genuine dispute of fact as to what the trade secret was. We had undisputed. We had Mr. Chester testifying that the prototype actuator that he designed and assembled was identical to every single limitation of allowed claim three. And Mr. Chester was an experienced engineer. So even when he says he expected it to meet a particular limitation, that should be reason enough to know that it would. Mr. Chester testified that he knew of no other actuator like it in the industry. It was secret. Both sides had expert testimony and neither expert find any mention of this type of actuator in the industry. Judge Wood, you mentioned the difference of what was special about solenoids. Well, solenoids were in the public domain, but the combination of these different solenoid valves, motor, pump, that's what made it special. And, Your Honors, we don't even need to worry about what was known then because the U.S. Patent Office looked at this claim and allowed it over the prior art so we know it was secret because it was patentable. The second question is whether it was secret. The evidence is that every single person who knew about this design testified that he understood that it was to be kept secret for the company. A jury should be able to decide whether that's correct and these were secret designs or whether Mr. Chester's right and that he can take those designs to a competitor MEA and patent them. Thank you, Your Honors. We're going to extend your time just a bit because Judge Hamilton has another question. One other question on this fee issue, Mr. Bailich. In your reply brief, I'm reading from page 27. Defendants' appellees argue that Rex's own attorney's fees exceeded those of defendants' appellees, citing the District Court and ECF 174.1 in Exhibit B. This allegation is baseless. The District Court cites no evidence. The document in ECF 174.1 nowhere provides such evidence. Defendant appellees have failed to explain how they reached this conclusion. We've just been told this was in 174-1 in Exhibit B. What am I going to see when I look at that about your fees? So, my understanding is that we provided our invoices and that attorney's fees for Rexa was about $1.8 million. So, significantly less than attorney's fees for defendants. So, this allegation is baseless how? If you're at 2.1 and 1.8? So, defendants argue that Rexa spent significantly more than defendants, and that's simply not true. Thank you. Mr. Bailich, with regard to the defense fees, is there a particular category or grouping of those fees that you're objecting to? Not a line item review, green shade, any of that, just a particular argument that you're offering as to why those invoices are not appropriate? Sure. The most obvious one being that this court has held that duplicative fees are not appropriate in a fee award. And you can see in the video that I'm standing here, and defendants have a number of counsel at their table. And that was endemic of this entire litigation where there were multiple attorneys doing the exact same thing. Are you the only person in the room? There's one other person in the room with me. Thank you. All right. Well, thank you to both counsel. We will take this case under advisement.